FILED
2015 Dec-22  PM 04:42
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | |
|---|---|
| **CLAUDE T. HARRELL, JR., Regional**<br>**Director of the National Labor Relations**<br>**Board, for and on behalf of the National**<br>**Labor Relations Board,**<br><br>    **Petitioner,**<br><br>**vs.**<br><br>**RIDGEWOOD HEALTH CARE**<br>**CENTER, INC.; RIDGEWOOD**<br>**HEALTH SERVICES, INC.,**<br><br>    **Respondents.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)        **CASE NO. 6:14-CV-2075-SLB**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

This case is before the court on Petition for Injunction under Section 10(j) of the

National Labor Relations Act [28 U.S.C. § 160(j)], (doc. 1),[1] filed by petitioner, Claude T.

Harrell, Jr., the Regional Director of the National Labor Relations Board [NLRB], for and

on behalf of the NLRB.  Upon consideration of the record, the submissions of the parties, the

arguments of counsel, and the relevant law, the court is of the opinion that the Petition for

Injunction under Section 10(j), (doc. 1), is due to be denied.

On September 19, 2013, the United Steel, Paper and Forestry, Rubber, Manufacturing,

Energy, Allied Industrial and Service Workers International Union [the Union] filed a

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.  Citations to page numbers refer to the page
numbers assigned to the document in the court's electronic filing system.

complaint alleging unfair labor practices against Ridgewood Health Care Center, Inc.

[RHCC] and Ridgewood Health Services, Inc. [RHS and, collectively, the Ridgewoods],

alleging violations of sections 8(a)(1), (3), and (5).[2]  Specifically, the Union alleged that

Ridgewoods violated § 8(a)(5) in the following manner:

> Failing and refusing to bargain over the decision to lay off all bargaining unit
> employees; failing and refusing to bargain over the effects of the decision to
> lay off all bargaining unit employees; announcing unilateral changes in terms
> and conditions of employment including seniority, health insurance, and wage
> rates; engaging in direct dealing and circumventing the Union by meeting with
> employees to announce changes in terms and conditions of employment;
> engaging in direct dealing and circumventing the Union [by] announcing to
> employees that they are "at will" and that the terms of employment will be set
> unilaterally by the Employer; failing and refusing to meet and confer with the
> Union and unlawfully withdrawing recognition from the Union by the above
> acts.

(Doc. 1-1.)  The Union amended its charge to add claims of violations of §§ 8(a)(1) and (3).

(Doc. 1-2.)  These claims were based on the Ridgewoods' "interrogat[ing] job applicants. .

. about their union membership and union activities," "threatening employees with a loss of

job security as a condition of continued employment," and "refus[ing] to hire unit employees

of the predecessor because of their union and protected activities in an attempt to avoid a

bargaining obligation with the union."  (*Id*. at 2.)

Although the underlying complaint alleged unfair labor practices occurring on or

before October 22, 2013, (*see* doc. 1 ¶¶ 6, 7(p)-(t), 7(x)-(y)), and the Director found cause

---

[2]The original complaint was not filed by the Director.  The document purporting to be the
original complaint was signed on February 11, 2014.  (*See* doc. 1 ¶ 3; doc. 1-1.)

in December 2013, (*see* doc. 4 at 7, 34), the Director did not file his Petition seeking a § 10(j) injunction with this court until October 27, 2014, (doc. 1).  In his Petition, the Director alleges five acts or series of acts of the Ridgewoods that constitute unfair labor practices:

> 1.  The Ridgewoods "unlawfully interrogated employees about their union membership;"

> 2.  The Ridgewoods "notified employees that they would no longer be represented by the Union;"

> 3.  The Ridgewoods "refused to hire or consider for hire [four] employees of [the] predecessor [employer, Preferred,] in order to evade successorship status and recognition of and bargaining with the Union;"

> 4.  The Ridgewoods "refused to recognize and bargain collectively with the Union as the exclusive collective-bargaining representative of an appropriate unit of [their] employees, . . . including refusing to provide the Union with requested information;" and

> 5.  The Ridgewoods "unilaterally changed employees' wages and other terms and conditions of employment in effect at the time of the transfer of operations from [Preferred] to [the Ridgewoods]."

(Doc. 1 ¶ 6.)  Based on these unfair labor practices, the Director asks the court to order immediate injunctive relief, including instatement of the four Preferred employees not hired by the Ridgewoods and immediate recognition of the Union as the exclusive bargaining agent for the employees of the bargaining unit, pending the outcome of the administrative proceedings before the NLRB.  (*Id*. at 15-17.)

## STATEMENT OF FACTS

In the proceedings before the ALJ, the parties stipulated to the following facts:

3

1.   Respondents are both Alabama corporations and have been since their respective incorporations. Respondent RHCC was incorporated in 1977 and RHS was incorporated in 2013.

2.   Since about 1977, Respondent RHCC, has owned property and a facility in Jasper, Alabama (herein called "the facility"), located at 201 Oakhill Road, that has been operated since that time as a nursing home.

3.   Since about October 1, 2013, Respondent RHS has operated the facility as a nursing home pursuant to a lease agreement with Respondent RHCC.

4.   Since October 1, 2013, Respondent RHS, in conducting its operations set forth in paragraph 3, purchased and received goods and services valued in excess of $5,000 directly from points outside the State of Alabama.

5.   In 2008, Joette Kelley Brown purchased Respondent RHCC and since that time has been an owner, an officer, and, in so doing, an agent of RHCC within the meaning of Section (13) of the National Labor Relations Act.  Ms. Brown owned 100% of RHCC until October 2013, when Alicia Stewart obtained 10% ownership.

6.   Since at least June 1, 2013, Stephen Brown has served as an officer of Respondent RHCC, and, in so doing, has been an agent of Respondent RHCC within the meaning of Section (13) of the National Labor Relations Act.

7.   Since about October 1, 2013, Stephen Brown has served as an officer of Respondent RHS, and, in so doing, has been an agent of Respondent RHS within the meaning of Section (13) of the National Labor Relations Act.

8.   In 2013 and 2014, RHCC's only revenue [came] from lease payments by Preferred prior to October 1, 2013, and by RHS subsequent to October 1, 2013.

9.   In July 2013, Joette Kelley Brown founded Respondent RHS and since that time has served as an owner and President, and, in so doing, has been a supervisor and agent of Respondent RHS within the meaning of Section 2(11) and (13) of the National Labor Relations Act.  Ms. Brown owned 100% of RHS until October 2013, when Alicia Stewart obtained 10% ownership.

4

10.  Since about July 2013, Alicia Stewart has served as Vice-President and Secretary of Respondent RHS and, in so doing, has been a supervisor and agent of Respondent RHS within the meaning of Section 2(11) and (13) of the National Labor Relations Act.

11.  Ms. Brown and Ms. Stewart have been responsible for the formulation and effectuation of labor relations policy for RHS from October 1, 2013 to the present.

12.  Ridgeview Health Care Center is a nursing home facility in Jasper, Alabama.

13.  Since 2008, Joette Kelley Brown has owned Ridgeview Health Care Center, Inc., which has leased the property on which Ridgeview Health Care Center is operated.

14.  Ridgeview Health Services, Inc. is a management firm that has operated a nursing home at the Ridgeview Health Care Center facility, since at least January 1, 2013.

15.  Since at least August 1, 2013, Kara Holland has served as Administrator of Ridgeview Health Services, Inc., at the Ridgeview Health Care Center facility and, in so doing, has been an agent of Ridgeview Health Services, Inc., within the meaning of Section 2(13) of the National Labor Relations Act, during August and September 2013; and Vicky Burrell has served as Director of Nursing for Ridgeview Health Services, Inc., at the Ridgeview Health Care Center facility, and, in so doing, has been an agent of Ridgeview Health Services, Inc., during August and September 2013.

16.  In August and September 2013, Kara Holland and [Vicky] Burrell conducted job interviews at the Ridgeview Health Care Center facility for some of the Preferred employees who applied for employment with Respondent RHS.

17.  From about September 24, 2004 until September 30, 2013, the Union had been the exclusive collective-bargaining representative of the Preferred employees described in paragraph 16 of the Order Consolidating

Cases,[3] Amended Consolidated Complaint and in successive collective bargaining agreements [CBAs], the most recent of which was effective beginning on September 24, 2010.

18.   Respondent RHCC had no involvement in negotiating the collective bargaining agreement between Preferred and the Union.

19.   Preferred operated the nursing home under the d/b/a "Ridgewood Health Care Center."  RHCC is a distinct legal entity that is separate from the d/b/a name used by Preferred.

20.   At no time has any owner of Respondent RHCC or Ridgeview owned any portion of Preferred or had any management role over Preferred, and, at no time, has Preferred's ownership had any ownership of RHCC, Ridgeview, or RHS, or had any role in their management.

21.   Respondent RHCC has had no involvement in the day-to-day operations of the Ridgewood facility during the time the facility was operated by Preferred.

22.   Preferred had sole responsibility for the entire operations of the facility, including the employees, patients, supplies, and legal requirements.

---

[3]This paragraph stated:

The following employees of Respondents (the Unit) constitute a unit appropriate for the purposes of collective bargaining within the meaning of Section 9(b) of the Act:

All full-time and regular part-time employees employed at Respondents' facility, including LPN's, nurses aides, housekeeping employees, dietary employees, laundry employees, maintenance employees, and the food supervisor (it is understood that in the event any of the preceding job titles change, they will remain in the bargaining unit), but excluding all office clerical employees, professional employees, guards and supervisors as defined in the Act.

(Doc. 14-2 at 15; *see also* doc. 14-3 at 59.)

23. Prior to October 1, 2013, neither Respondent RHCC nor its owners or officers had any involvement in the employment of Preferred's workforce or the day-to-day operation of the facility.

24. From at least September 24, 2004 to the present, Respondent RHCC has not had any employees.

25. The lease agreement between Preferred and Respondent RHCC was terminated effective September 30, 2013.

26. On July 29, 2013, Preferred employees were notified by letter that Preferred would no longer operate the facility after September 30, 2013, and that their positions with Preferred would be eliminated after September 30, 2013.

27. Respondent RHS began operating the facility on October 1, 2013.

28. Prior to beginning its operation of the facility on October 1, 2013, Respondent RHS had no involvement in the employment of individuals working for Preferred and was never a party to the CBA between Preferred and the Union.

29. Respondent RHS provided Preferred employees a three week period, beginning August 13, 2013 and continuing until August 30, 2013, to apply for positions considered bargaining unit positions with Preferred, during which time period, only Preferred employees were allowed to apply. Preferred employees were informed of this time period during which they could apply before other candidates were considered.

30. Prior to August 13, 2013, Preferred posted a notice to its employees near the facility's time clock containing information about the application process.

31. Prior to August 13, 2013, representatives of Respondent RHS met with Preferred employees to explain the application process.

32. After August 30, 2013, RHS began advertising for vacant positions and opened the application process to individuals who had not been employed by Preferred.

33.   Respondent RHS received one-hundred and eleven (111) applications for positions considered bargaining unit positions with Preferred from individuals who had not worked at Preferred.

34.   Sixty-five (65) Preferred employees who were in bargaining unit positions for Preferred applied for positions for Respondent RHS.

35.   Respondent RHS hired 51 employees employed by Preferred and hired 56 employees who were not employed by Preferred to begin working at the facility on October 1, 2013, performing work which had been performed by the positions in Preferred's bargaining unit.

36.   Crystal Bland, Erin Cooke, Shirley Courtney, Kimberly Lindsley, Karrie O'Neal and Crystal Pool were offered and accepted employment with Respondent RHS at the facility to begin on October 1, 2013, but never reported for work.

37.   On October 1, 2014, Respondent RHS employed 101 employees in positions performing work which had been performed by the positions in Preferred's bargaining unit, 49 of whom were previously employed at the facility by Preferred.

38.   In the six weeks after October 1, 2013, RHS hired an additional twenty-two (22) outside, non-Preferred applicants into positions performing work which had been performed by Preferred's bargaining unit

39.   In its letters offering employment, Respondent RHS informed all new hires that their employment with Respondent RHS would be "at will" and that the terms and conditions of their employment would be set by Respondent RHS and could change from time to time.

40.   The following Preferred employees applied for work with Respondent RHS prior to August 30, 2013, but were not hired:

| | |
|---|---|
| Paul Borden | Midge Lechey |
| Lacey Cox | Teresa Diane McClain. |
| Betty Davis | Connie Sickles |
| Gina Eads (Harrison) | Hope Kimbrell |
| Vegas Wilson | |
| Charlotte Kimborough | |

. . .

42.  Connie Sickles was terminated from Ridgeview in 2012.

. . .

44.  Former Preferred employee Betty Davis was terminated from Ridgeview in 2003.

45.  Former Preferred employee Gina Eads (Harrison) was terminated from Ridgeview in 2012.

. . .

48.  Respondent RHS has not recognized or bargained with the Union at any time as the exclusive collective-bargaining representative of any of its employees.

(Doc. 14-3 at 11-17.)

Following a hearing, the ALJ made the following "Conclusions of Law"[4] –

3.  At all material times, the Union has been, and continues to be, the exclusive bargaining representative of LPN's, nurses aides, housekeeping employees, dietary employees, laundry employees, maintenance employees,

---

[4]The underlying matter remains pending before the NLRB.  Pursuant to section 10(c) –

In case the evidence is presented before a member of the Board, or before an administrative law judge or judges thereof, such member, or such judge or judges as the case may be, shall issue and cause to be served on the parties to the proceeding a ***proposed report***, together with a ***recommended order***, which shall be filed with the Board, and if no exceptions are filed within twenty days after service thereof upon such parties, or within such further period as the Board may authorize, such recommended order shall become the order of the Board and become effective as therein prescribed.

29 U.S.C. § 160(c).  Both sides filed exceptions to the ALJ's decision.  (Doc. doc. 24 at 2; doc. 25 ¶ 3.)

and the food supervisor employed by the Respondents at the Ridgewood facility in [Jasper], Alabama.

4.  By (1) refusing to recognize and bargain with the Union on July 15, 2013 and continuously thereafter, (2) unilaterally changing terms and conditions of employment of the predecessor's employees commencing on October 1; and (3) refusing to provide the Union with information requested on September 13 and 25, and October 1, 2013 that was necessary and relevant to the collective-bargaining agreement, the Respondents have engaged in unfair labor practices within the meaning of Section 8(a)(5) and (1) of the Act.

5.  The Respondents violated Section 8(a)(1) by:  (1) interrogating bargaining unit employees by inquiring about their union membership during job interviews during September 2013; (2) informing bargaining unit members in August 2013 that they would not recognize the Union and would unilaterally change their terms and conditions of employment; and (3) warning an employee in December 2013 that she would be terminated if she supported the Union.[5]

6.  The Respondents violated Section 8(a)(3) and (1) of the Act in September 2013 by engaging in the following discriminatory hiring scheme in order to avoid its bargaining obligation with the Union:  (1) creating a new job classification in order to create a workforce composed of less than a majority of the predecessor's employees in order to avoid its bargaining obligation with

---

[5]The Director has not raised this issue before the court.

the Union;[6] and (2) refusing to hire the following unit employees:  Betty Davis, Gina Eads, Connie Sickles and Vegas Wilson.

(Doc. 21-1 at 20-21 [footnotes added].) Following the ALJ's decision, the Director withdrew

any request for injunctive relief based on the failure to hire Borden, Cox, Kimbrell,

Kimborough, Lechey, McClain, and Waldrup.  (Doc. 20 at 1-2.)

## DISCUSSION

Section 10(j) of the National Labor Relations Act, codified as 28 U.S.C. § 160(j),

provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such

---

[6]The ALJ found that the Helping Hands position was not part of the bargaining unit at Preferred.  The court notes that the job duties performed by Helping Hands were performed by bargaining unit employees at Preferred, albeit Preferred had no position precisely equivalent to the Helping Hand position.  The Director contends that the bargaining unit includes:

> ***All full-time and regular part-time employees employed at Respondents' facility***, including LPN's, nurses aides, housekeeping employees, dietary employees, laundry employees, maintenance employees, and the food supervisor (it is understood that in the event any of the preceding job titles change, they will remain in the bargaining unit), but ***excluding all office clerical employees, professional employees, guards and supervisors*** as defined in the Act.

(Doc. 1 ¶ 7(w)[emphasis added].)   Helping Hands employees clearly fall within this definition of the bargaining unit. Nevertheless, for purposes of deciding the Director's § 10(j) Petition, the court has assumed this position is outside the bargaining unit.

> petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

28 U.S.C. § 160(j).  The Eleventh Circuit has "fashioned a bipartite test for determining the propriety of temporary relief:  (1) whether the Board, through its Regional Director, has reasonable cause to believe that unfair practices have occurred, and (2) whether injunctive relief is equitably necessary, or, in the words of the statute, 'just and proper.'"  *N.L.R.B. v. Hartman and Tyner, Inc.*, 714 F.3d 1244, 1250 (11th Cir. 2013)(quoting *Boire v. Pilot Freight Carriers, Inc.*, 515 F.2d 1185, 1188-89 (5th Cir. 1975)).[7]  Because the court finds that injunctive relief is not "just and proper," the court will assume, rather than decide, that reasonable cause exists to believe unfair labor practices have occurred.  *See Johnson ex rel. N.L.R.B. v. Sunshine Piping, Inc.*, 238 F. Supp. 2d 1297, 1302 (N.D. Fla. 2002)("even if reasonable cause is shown, injunctive relief is not appropriate unless it can also be demonstrated that such relief would be just and proper given the circumstances of the case.")(citations omitted).

"Section 10(j) is itself an ***extraordinary*** remedy to be used by the Board ***only*** when, in its discretion, an employer or union has committed such ***egregious unfair labor practices*** that any final order of the Board will be ***meaningless*** or so ***devoid of force*** that the remedial purposes of the Act will be frustrated."  *Pilot Freight Carriers*, 515 F.2d at 1192 (emphasis

---

[7]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc).

added); *see also Arlook for & on Behalf of N.L.R.B. v. S. Lichtenberg & Co.*, 952 F.2d 367, 372 (11th Cir. 1992)(quoting *Pilot Freight,* 515 F.2d at 1192).   "[I]f a harm is of a routine character in the NLRA context, the parties usually can redress such wrongs under the NLRB administrative processes."   *McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 299 (5th Cir. 2015).  "[C]are must be taken [by the court] so that [§ 10(j) injunctive relief] remains an ***extraordinary*** remedy, to be requested by the Board and granted by a district court ***only*** under ***very limited*** circumstances."  *Hartman and Tyner*, 714 F.3d at 1249 (quoting *S. Lichtenberg & Co.*, 952 F.2d at 374) (emphasis added).

In this case, the Director filed an Offer of Proof regarding the alleged unfair labor practices, in which he contends:

> [T]here is reasonable cause to believe that Respondents (a) unlawfully interrogated employees about their union membership; (b) notified employees that they would no longer be represented by the Union; (c) refused to hire or consider for hire approximately 11 employees of its predecessor in order to evade successorship status and recognition of and bargaining with the Union; (d) refused to recognize and bargain collectively with the Union as the exclusive collective-bargaining representative of an appropriate unit of Respondents' employees, including refusing to provide the Union with requested information; and (e) unilaterally changed employees' wages and other terms and conditions of employment in effect at the time of the transfer of operations from the predecessor employer to Respondents.

(Doc. 17 at 3.)[8]  For the reasons set forth below, the court finds these alleged unfair labor practices are not "such egregious unfair labor practices that any final order of the Board will be meaningless or so devoid of force that the remedial purposes of the Act will be frustrated." *Pilot Freight Carriers*, 515 F.2d at 1192.

## A. EGREGIOUS CONDUCT

"[A] § 10(j) injunction is an 'extraordinary remedy' to be employed only in the event of ***egregious*** unfair labor practices.  To constitute '***egregiousness***' for purposes of § 10(j), a labor practice must lead to ***exceptional*** injury, as measured against other unfair labor practices." *McKinney ex rel. N.L.R.B. v. Creative Vision Res., L.L.C.*, 783 F.3d 293, 299 (5th Cir. 2015)(quoting *Pilot Freight Carriers*, 515 F.2d at 1192)(internal quotations and citation omitted; emphasis added).  The unfair labor practices in this case do not rise to the level of egregious conduct.

### 1. "Unlawfully Interrogated Employees about Their Union Membership"

In his Offer of Proof, the Director contends:

---

[8]At a telephone conference on January 6, 2015, the court informed counsel for the Director that it would not review the record of the proceedings before the ALJ and that the Director would be expected to specifically submit and reference the evidence upon which he relied.  Despite these instructions to counsel, several weeks later, counsel filed a Motion to Try Petition on the Basis of the Record in the Underlying Proceedings, (doc. 11), which was summarily denied. Two days later, on the eve of the hearing, the Director's counsel filed a Motion to Reconsider and submitted the administrative record, which consists of over 1200 pages, untethered to any meaningful citations.  (Doc. 14.)  At the hearing, counsel for the Director made an Offer of Proof, citing to the administrative record.  (Doc. 17.)  The court has considered only those pages of the administrative record cited by the Director in his Offer of Proof.

> During interviews for positions at Respondents' facility, on various dates from August 8, 2013, through August 30, 2013, Respondents interrogated several of the Preferred employees about their union membership (TR McPherson at 102-103; TR Borden at 222)[9] and about deductions from their checks (TR Wilbert at 131, TR Davis at 250-51) which coerced some employees to reveal that they paid Union dues (TR Wilbert at 131; TR Davidson Ramos at 150).

(Doc. 17 ¶ 17 [footnote added].)  Pam McPherson testified that she was asked during her interview if she was in the Union, to which she answered, "no."  (Doc. 14-1 at 103.) McPherson worked as a clerical employee and she was not part of the bargaining unit.  (*Id*. at 102.)  Paul Borden, who worked in Maintenance, testified that he was asked whether he was in the Union, to which he answered "no."  (*Id*. at 219, 225.)  He testified that he "was in the union bargaining at the time."  (*Id*. at 225.)  The Director has not cited any other evidence of direct questioning of applicants about Union membership.

The Director has alleged that other applicants were "coerced" into revealing they paid Union dues.  (Doc. 17 ¶ 17.)  However, Crystal Wilbert, a dietary aide, testified that she had "***voluntarily*** told [the interviewer that she] was a union member" when she was asked about her deductions from her paycheck.  (Doc. 14-1 at 130-31, 133 [emphasis added].)  She did not mention any coercion or threat or that she felt coerced into revealing her Union membership.  (*See id*.)  Betty Davis, a CNA, testified that she was asked "what kind of deduction was taken from [her] check" and that she told the interviewer.  (*Id*. at 250-51, 254.)

---

[9]The Director uses "TR" to refer to the transcript of the ALJ's hearing, which is document 14-1 in the court's record.

She did not testify that she had mentioned Union dues or that she was coerced or felt coerced into mentioning her membership in the Union. (*Id*. at 253-54.) Becky Ramos, who works in Housekeeping, testified that she was asked "what was taken out of [her] check," and she replied that she had union dues, vision and dental insurance, long-term disability insurance, and 401(k) contributions deducted from her paycheck. (*Id*. at 146-47, 152.) She, like Davis and Wilbert, did not testify that she was coerced or felt coerced into revealing her Union membership. (*Id*. at 152.)

The evidence cited by the Director shows that five applicants were questioned, directly or indirectly, about their Union membership,[10] but no employee was coerced or felt coerced into talking about their Union membership or Union support. Although the Director asserts that the Ridgewoods ***coerced*** job applicants to reveal Union membership, "coercion" implies a use of force or a threat to compel the person to act. Absolutely nothing in the record cited by the Director indicates that the interviewers did anything more than ask and no applicant testified that he or she felt compelled or threatened to reveal Union membership or support. Assuming that asking about Union membership and paycheck deductions for Union dues constituted an unfair labor practice, it is certainly not egregious and/or extraordinary when compared to other interrogation cases. *See Mead Corp. v. N.L.R.B.*, 697 F.2d 1013, 1025-26 (11th Cir. 1983); *Weather Tamer, Inc. v. N.L.R.B.*, 676 F.2d 483, 490

---

[10]Of these five applicants, the Director alleges that only Betty Davis was not hired by the Ridgewoods in order to avoid successor status. (*See* doc. 17 ¶ 19; doc. 20 at 1-2.)

(11th Cir. 1982). No evidence cited in the Director's Offer of Proof proves that interrogation occurred outside the application process in August 2013, more than a year before the instant action was filed.

The evidence offered by the Director does not support any inference of coercion or otherwise threatening questioning about Union membership and support. Therefore, the court finds this unfair labor practice is not "extraordinary" when compared to other NLRB cases alleging similar unfair labor practices.

### 2. "Notified Employees That They Would No Longer Be Represented by the Union"

According to the Director's Offer of Proof,

> 21. Since about September 2013, Respondents, by letter, made clear to Preferred employees that it had no intention of recognizing the Union when it made written offers of employment to some of the interviewed Preferred employees, notifying these employees that they would be at will employees, they could be terminated at any time without cause and that they would be subject to terms and conditions of employment set by Respondents. (JA Ex. 2, ¶ 39; JA Ex. 12.)[11]

> . . .

> 26. About October 22, 2013, Respondents, by letter, announced to employees that they were no longer represented by the Union and that Respondents would deal directly with employees regarding terms and conditions of employment. (JA Ex. 17.)

(Doc. 17 ¶¶ 21, 26 [footnote added].)

_____

[11]"JA" refers to the joint exhibits submitted at the hearing before the ALJ, which is document 14-3 in the court's record. "JA Ex. 2" is the parties' Joint Stipulation of Facts. (*See* doc. 14-3 at 10-18.)

The first letter referred to by the Director was the job offer sent by Brown to all employees of RHS.  (Doc. 14-3 at 60.)  In pertinent part, the letter states:

> Your employment with Ridgewood Health Services, Inc., will be at-will and either party can terminate the relationship at any time with or without cause and with or without notice.  Your employment also will be subject to the terms and conditions of employment which will be set by Ridgewood Health Services, Inc. and which may change from time to time.

(*Id*.; *see also* doc. 14-3 at 16 ["In its letters offering employment, Respondent RHS informed all new hires that their employment with Respondent RHS would be 'at will' and that the terms and conditions of their employment would be set by Respondent RHS and could change from time to time."].)  This statement of fact, as understood by RHS at the time, does not express any hostility toward the Union or Union membership.  Indeed, the letter does not mention the Union.  At the time the letter was sent, RHS had already made its decisions regarding which Preferred employees it would hire and it had an idea of the total number of employees it needed to fully staff the facility.  It had calculated that former Preferred employees would account for less than half of its work force.  *See Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 41 (1987)("Where . . . the union has a rebuttable presumption of majority status, this status continues despite the change in employers.  And the new employer has an obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and ***the majority of its employees were employed by its predecessor***.")(emphasis added).  Therefore, at the time they began operating the

facility, the Ridgewoods were contending they were not the successor to Preferred.  RHS's letter to the new employees does no more than set forth this contention.

The second letter, sent on October 22, 2013, is also from Brown.  This letter sets forth her beliefs regarding Unions; it states, in pertinent part, "the Ridgewood facility is now operating without a union," and, "I have a vision of creating an environment at Ridgewood that is a great place to be for our residents and our employees, and I think we can best accomplish this vision if we work directly together to make this happen.  I think that without a union we can be our most productive, efficient and flexible so that this facility will prosper."[12]  (Doc. 14-3 at 67.)

The court finds these letters are not "extraordinary" unfair labor practices.  They are not threatening and do no more than state the current state of affairs as perceived by Brown.[13]  Moreover, these letters were sent after the Ridgewoods had interviewed and hired applicants from Preferred and at a time when the Ridgewoods had determined that former Preferred employees would not compromise a majority of their workforce.  *See N.L.R.B. v. Burns Int'l Sec. Servs., Inc.*, 406 U.S. 272, 295 (1972)("[I]t may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a

---

[12]This letter also discusses union organization efforts and the signing of union cards, but the Director's Offer of Proof states only that the letter "announced" the Union no longer represented the employees and that employees would negotiate directly with management. (Doc. 17 ¶ 26.)  The court assumes the Director has no objection to the statements by Brown regarding Union cards and organization efforts.

[13]See, *supra*, note 11.

union, since it will not be evident until then that the bargaining representative represents a

majority of the employees in the unit . . . .").

These two letters, sent after the Ridgewoods had determined – presumably wrongfully

– that they were not the successor to Preferred, do not constitute an egregious or

extraordinary unfair labor practice.

### 3. "Refused to Hire or Consider for Hire [Four] Employees of its Predecessor in Order to Evade Successorship Status and Recognition of and Bargaining with the Union"

Based on the ALJ's Decision, the Director has reduced the number of employees he

claims were wrongfully denied employment with the Ridgewoods, from the original eleven

to four.  (Doc. 20 at 1-2.)  With regard to three of these employees – Betty Davis, Gina Eads,

and Connie Sickles – the Director offered the following:

> Respondent claims [these employees] were not hired because they had been previously fired from Brown's other nursing home, Ridgeview.  But Respondents told Preferred employees that former Ridgeview employees who had been fired by Ridgeview would be eligible to work for Respondent at the Ridgewood facility.  (TR Kimbrell at 58-59.)  Ms. Davis'[s] discharge from Ridgeview was in 2003, 10 years prior to applying with Respondent.  (TR Davis at 252.)

(Doc. 17 ¶ 19(c).)  The Director has offered nothing regarding Vegas Wilson.  (*See generally*

docs. 1, 2, and 17.)  However, the Ridgewoods argued that Wilson was not hired because

"[t]he Director of Nursing . . . informed RHS that Ms. Wilson was terminated from [another]

facility for engaging in a physical and verbal altercation with another employee," and "that

Ms. Wilson displayed a threatening demeanor toward staff and management employees at the other facility."  (Doc. 6 at 19 [citing, *inter alia*, doc. 6-1 at 8].)

Assuming the Ridgewoods failed to hire these four former Preferred employees in an effort to evade successorship status, the court finds the Ridgewoods' conduct was neither egregious nor extraordinary when compared to similar cases.  The Director cites the case of *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001); however, that case is readily distinguishable from the instant action.  In *Bloedorn*, for example, the new employer specifically told the predecessor's employees/applicants that she was making her hiring decisions in order to keep the union out.  *Id*. at 276-83.  The court found the Director had presented evidence that the new employer:

> made no secret of its intent, declaring from the beginning of the transition that it would not recognize the Union when it assumed ownership of the store. Over the course of the hiring process, [the new employer's] stated goal of keeping [predecessor's] employees in the minority, her remark to [one employee] that "she'd hire us all back if we would vote out the union," her remark to [another employee] that he would have been fired if she had to take the Union back, and her inquiry as to whether [a] long-time cashier . . . could work "for a nonunion store," conveyed an unmistakable message that union representation jeopardized the hiring prospects of [the predecessor's] employees.

*Id*. at 298 (internal citations omitted).  The Director also presented evidence that the new employer delayed making decisions on hiring the predecessor's employees until after the store reopened and even told one employee that she was only hiring 50% of the predecessor's employees to keep the union out.  *Id*. at 278-79.

This case lacks any such evidence of overt calculation and threats.  *Compare TCB Sys., Inc. v. N.L.R.B.*, 448 Fed. Appx. 993, 996 (11th Cir. 2011).  Indeed, the Director has withdrawn seven of its eleven claims of discriminatory failure to hire Preferred employees and has offered no evidence of discrimination with regard to another.  Certainly he has not directed the court to evidence of conduct similar to the type of egregious conduct at issue in *Bloedorn*.

### 4.  Refused to Recognize and Bargain Collectively with the Union as the Exclusive Collective-Bargaining Representative of an Appropriate Unit of Respondents' Employees, Including Refusing to Provide the Union with Requested Information

The Director contends:

> 29.   Since October 1, 2013, Respondents have continued to tell employees that there is no [U]nion at the facility. (JA Ex. 17.)

> 30.   On October 1, 2013, the Union requested in writing that Respondent recognize and bargain with it because it had hired a substantial and representative complement of its workforce, a majority being former Preferred employees. (JA Ex. 15.)

> 31.  On October 7, 2013, Respondents refused the Union's request. (JA Ex. 16.)

(Doc. 17 at 9-10.)  The only evidence cited by the Director as support for his assertion that "Respondents have **continued** to tell employees that there is no union at the facility," is the ***October 22, 2013***, letter set forth above.  (*See* doc. 14-3 at 67-68.)  This single letter does not support an inference of continuing conduct.  Moreover, the only evidence cited for the

Ridgewoods' refusal to provide documents to the Union is a single letter from the Ridgewoods' counsel, in which counsel stated:

> As stated in your letter dated October 1, 2013, [RHS] began operating the Ridgewood facility on October 1, 2013; however, due to the fact that the Company took over the facility sooner than it originally anticipated and the fact that *a lower than expected number of Preferred employees applied to work with Ridgewood, the Company still is actively filling positions and anticipates hiring many more employees in the near future*. The facility is not yet operating normally, is having to make use of temporary help, and employees are being scheduled on a shift to shift basis.
>
> Moreover, even if it was assumed that the Company had hired a substantial and representative complement of its workforce by the first day of operations as you assert, *the majority of employees hired in job positions that were in the bargaining unit represented by the USW were not previously employed by Preferred*. Therefore, even if a substantial and representative complement had been hired, [RHS] would not be a successor and will not and indeed cannot recognize the USW as the representative of those employees. Likewise, it has no obligation to respond to your requests for documents.

(Doc. 14-3 at 66.)

Although the failure to deal with the Union may be an unfair labor practice, the Ridgewoods' statements cited by the Director do not constitute an egregious or extraordinary unfair labor practice. The Director has provided no evidence that the Ridgewoods have done anything more than insist that it is not the successor to Preferred, which is a fact present in every successor case. As such, the court finds no egregious or extraordinary unfair labor practice has been shown as to the Ridgewoods' refusal to negotiate with the Union.

23

### 5.  Unilaterally Changed Employees' Wages and Other Terms and Conditions of Employment in Effect at the Time of the Transfer of Operations from the Predecessor Employer to [The Ridgewoods]

In his Offer of Proof, the Director contends:

> 28.  Starting on October 1, 2013 and continuing, Respondents have implemented unilateral changes to employees['] terms and conditions of employment including a new handbook, health insurance with reduced benefits, elimination of seniority, elimination of a grievance procedure, a different shift differential rate of pay, reduced vacations, and reduced holidays, and elimination of 401K retirement benefits. (TR Dudley at 267-92; TR Thomas at 164-166; TR Tidwell at 191-192; JA Ex. 2 ¶ 48; JA Ex. 20; GC Ex. 1(o).)[14]

(Doc. 17 ¶ 28 [footnote added].)

The Supreme Court has "acknowledged the interest of the successor in its freedom to structure its business and the interest of the employees in continued representation by the union. . . .  And the new employer has an obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor." *Fall River Dyeing & Finishing Corp. v. N.L.R.B.*, 482 U.S. 27, 41 (1987).  Therefore, only if the new employer is a successor does that employer have the obligation to negotiate with the incumbent Union before structuring its new business.  However, even though the successor employer has to negotiate, it usually does not have to accept the predecessor's terms and conditions or its collective bargaining agreement with the Union.  *See New England Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339,

---

[14]"GC" refers to general counsel's exhibits submitted at the hearing before the ALJ; these exhibits are found in document 14-2 of the court's record.

1342 (9th Cir. 1990)("In general, if an employer takes over another business, the employer is not bound by its predecessor's collective bargaining agreements.  At most, the employer will be required to bargain with any unions that the predecessor employer had recognized.  Even then, the new employer will only have a duty to bargain with a union if the new employer is a 'successor' employer." (citing *Fall River*, 482 U.S. at 40; *Sheet Metal Workers Int'l Ass'n, Local No. 359 v. Arizona Mech. & Stainless, Inc.*, 863 F.2d 647, 651 (9th Cir. 1988)))(internal citations omitted).

Therefore, this unfair labor practice requires proof that the Ridgewoods are the successor to Preferred.  However, to prove entitlement to a § 10(j) immediate injunction, as set forth above, the Director must show that this failure to negotiate before setting the initial terms and conditions was "egregious" or extraordinary when compared to similar unfair labor practices.  None of the evidence cited in the Director's Offer of Proof proves anything other than that the terms and conditions were changed.

For example, the Director cites the court to paragraph 48 of the parties' Joint Stipulation of Facts, which states in its entirety, "Respondent RHS has not recognized or bargained with the Union at any time as the exclusive collective-bargaining representative of any of its employees."  (Doc. 14-3 at 17, ¶ 2.)  Moreover, he cites the court to the RHS Handbook and the Ridgewoods' Answer to the Complaint and Notice of Hearing, without any citation to specific pages.  (Doc. 17 ¶ 28 [citing "JA Ex. 20," found at doc. 14-3 at 99-108, and "GC Ex. 1(o)], found at doc. 14-3 at 32-39].)  The court declines to search these

documents for evidence supporting the Director's claims.  However, the evidence is not disputed that the Ridgewoods set the initial terms and conditions of employment and these terms and conditions were different from those of Preferred, the predecessor.

Also, the Director cites the testimony of three employees – Cynthia Dudley, a CNA, Debra Thomas, a CNA, and  Joann Tidwell, a laundry worker.  However, none of these employees testified to egregious, extraordinary, or continuing actions by the Ridgewoods:

- Thomas testified that she went from 30 days vacation to 5 days.  (Doc. 14-1 at 166.)  She also testified that the Ridgewoods eliminated two holidays – the employee's birthday and anniversary date.  (*Id*. at 167.)

- For Paid Time Off [PTO], Dudley testified that she had received 30 days per year and with the Ridgewoods she receives "Ten sick days and seven vacation days [from] the way [she] understand[s] . . . the handbook."  (*Id*. at 272.)

- Tidwell testified that the shift differential changed.  (*Id*. at 194.)  She did not testify how the shift-differential had changed.  (*See id*.)

- Dudley testified,  "They took down the seniority list, so I'm assuming we don't have seniority now."  (*Id*. at 270.)

- Tidwell testified, "[T]hey changed our Blue Cross over to a different rider [and] [t]hey changed our dental and the vision over to another company."  (*Id*. at 193.)  She also testified that she had higher co-pays.  (*Id*.)

- Thomas testified, "Well, I didn't used to have to pay for x-rays and stuff when I'd go to the doctor and lab work.  Now I have to pay."  (*Id*. at 167.)  She also testified, "We had Aflac insurance and other types of insurance that they no longer do there," and "[w]e don't have retirement."  (*Id*. at 167.)

- With regards to health insurance, Dudley testified, "It's still Blue Cross, but . . . if you go in the hospital, you pay $250 for the first 6 days, and

26

some on some of the tests, . . . it upped in price.  And with our old insurance, we paid $300 to use the hospital."  (*Id*. at 273.)

- Tidwell and Dudley  testified that the Ridgewoods eliminated or changed the 401(k).  (*Id*. at 193, 270.)

- As Local President, Dudley was notified of all discipline before the Ridgewoods took over, but she had not been notified of any discipline since the transition.  (*Id*. at 280.)

The court notes that the Director has not cited the court to evidence that the changes in the terms and conditions were designed and intended to intimidate or threaten Union members and supporters or that the "unilateral changes" were not the initial terms and conditions set by the Ridgewoods.  *See Burns Int'l Sec. Servs., Inc.*, 406 U.S. at 294-95 (Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms.").  The initial changes about which the Director complains affected all employees regardless of whether the employee was previously employed by Preferred.  Moreover, the Director has not cited evidence that, before October 1, 2013, the Ridgewoods' status as a successor was "perfectly clear."  *See Burns*, 406 U.S. at 294-95.  Unilaterally setting the initial terms and conditions in a successor situation is an ordinary and routine – not egregious or extraordinary – unfair labor practice present in virtually every successor case in which the new employer does not recognize the Union.  Nothing about the situation at the facility in

this case demonstrates that the Ridgewoods' conduct rises above the employer conduct of the routine, ordinary successor case.

Although every unfair labor practice causes some harm, the harms in this case, as shown by the evidence cited by the Director, are routine and were largely complete long before the Director filed his Petition for immediate injunctive relief. The court finds that the wrongful conduct in this case is not egregious or extraordinary such that an immediate injunction would be just and proper.

## B.  FINAL ORDER OF THE NLRB

"[Section] 10(j) relief is only appropriate when any final order of the NLRB would be meaningless and the remedial purposes of the Act will be frustrated without an injunction to preserve the status quo. Thus, injunctive relief should issue when harms are ongoing, yet incomplete and likely further to harm the union or its supporters in the workforce." *Creative Vision Res.*, 783 F.3d at 299 (internal citations omitted). In this case, the court finds the Director has not proven that the Board's Order will be meaningless or the remedial purposes of the NLRA would be frustrated without an immediate injunction.

### 1.  Instatement

In his Petition, the Director asks the court to order the Ridgewoods –

[To] [o]ffer interim employment in writing to all affected employees [Betty Davis, Gina Eads, Connie Sickles, and Vegas Wilson] who were not considered for or offered employment on or about October 1, 2013, without prejudice to their seniority or other rights and privileges previously enjoyed, displacing, if necessary, any employees hired, transferred or reassigned to replace them[.]

(Doc. 1 at 16.)  The Director contends that this immediate injunctive relief is just and proper because, "Without interim employment at the facility, many of the [four] individuals will likely move on to other jobs and be unable to accept offers of employment under a Board order. . . .  Interim employment is necessary to restore the leadership necessary for effective bargaining.  Also, the long separation from the unit may diminish their support for the Union if they do ultimately return to work."  (Doc. 2 at 30 [footnotes omitted].)

The court notes that the Director has cited the court to no evidence that these four individuals are necessary for Union leadership or that support for the Union will be diminished during the interim such that the Union will not be able to resume its representation of the Ridgewood employees if the NLRB orders recognition of the Union. Moreover, the court rejects any argument by the Director that immediate instatement is necessary because these "individuals will likely move on to other jobs and be unable to accept offers of employment under a Board order."  *See id*.  The Director did not file his Petition asking for immediate instatement of these employees until over a year after the Ridgewoods began operation of the facility.  The court finds that any individual that could "move on" did not wait a year to do so.  The court finds the Director's delay of over a year in seeking instatement for these employees makes such relief unjust and improper.  *See Hartman & Tyner*, 714 F.3d at 1252 ("delay makes it difficult to justify granting temporary injunctive relief when that relief may not be any more effective than a final Board order

29

several months after the alleged unfair labor practices have occurred")(internal quotations and citations omitted).

The court finds having waited over a year following the Ridgewoods' hiring decisions to seek instatement of those individuals it claims were wrongfully denied employment, the Director has demonstrated that instatement of these individuals may await the final decision of the NLRB.  Therefore, the Director's request for an immediate injunction instating the four previous employees of Preferred to positions with the Ridgewoods will be denied.

### 2.  Recognize and Bargain with Union

The Director asks the court to order the Ridgewoods:

> (2)  [To] [r]ecognize and bargain with the Union as the exclusive bargaining representative of Unit employees during the interim period, including providing the Union with requested information; [and]

> (3) Upon the Union's request, [to] rescind any and all unilateral changes in wages, hours and working conditions that Respondents implemented for Unit employees at or since the time it took over the operation of the Jasper, Alabama, facility on or about October 1, 2013, and to restore all wages, hours and terms and conditions of employment to the state they existed on September 30, 2013[.]

(Doc. 1 at 16.)  He contends that this relief is "just and proper" because:

> Without an interim bargaining order, in the non-union environment created by Respondents, employees' support for the Union will erode as the Union is unable to protect them or affect their working conditions while the case is before the Board.  Successorship is an unsettling transition period during which the Union is in a peculiarly vulnerable position.  Respondents' refusal to bargain with the Union disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions. Employees' interest in the Union will wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. . . .  Not

surprisingly, employee support has already begun to dissipate, causing the Union to hold fewer meetings with the employees.[15]

The Union's lost support will not be restored by a final Board order because by then it will be too late. The longer the Union is kept from working on behalf of Respondents' employees, the less likely it will be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining. Employees will shun the Union or have little reason to support it because of its inability to improve their working conditions for years.[16]

Union loss of support, in turn, will make the Board's final bargaining order meaningless. The Union needs the support of Respondents' employees in order to bargain effectively. Without it, the Union will have no leverage and will be hard-pressed to secure improvements in wages and benefits at the bargaining table. No effective collective bargaining will occur under the Board's final order. There is a very real danger that employee support will

---

[15]In his Offer of Proof, the Director states, "Since October 1, 2013, the Union has held only one union meeting, compared to quarterly meetings previously." (Doc. 17 ¶ 29 [citing "TR Dudley at 283," found at doc. 14-1 at 286].) The evidence cited by the Director does not support a finding that the lack of Union meetings was caused by waning employee support for the Union. Dudley testified the lack of Union meetings was the result of her inability to post on bulletin boards at the facility:

> Q. And since Ms. Brown's company, how often had you had union meetings?
>
> A. Had one.
>
> Q. One? Why is that?
>
> A. Because we can't post it on the bulletin board. And people's working doubles, and it's hard to get them on the phone.

(Doc. 14-1 at 286.)

[16]There has been no evidence presented of anti-union sentiment arising from the fact that the Union has been excluded from negotiations with the Ridgewoods. Indeed, Brown has apparently made clear that the lack of a Union presence is not the fault of the Union.

erode to such an extent that the Union could no longer represent those employees.  Respondents will continue to reap the benefits of its unlawful conduct even after the order to bargain either because the Union is gone or because it is too weak to bargain effectively.  Thus, Respondents will defeat the Union, elude its bargaining obligation, and frustrate the intent of Congress by virtue of its unlawful actions.

(Doc. 2 at 24-26 [footnotes and internal quotations omitted].)  When asked at the hearing what evidence supported a finding that the injunction would be "just and proper," counsel for the Director referred the court to the following paragraphs in the Offer of Proof:

28.  Starting on October 1, 2013 and continuing, Respondents have implemented unilateral changes to employees terms and conditions of employment including a new handbook, health insurance with reduced benefits, elimination of seniority, elimination of a grievance procedure, a different shift differential rate of pay, reduced vacations, and reduced holidays, and elimination of 401K retirement benefits. (TR Dudley at 267-92; TR Thomas at 164-166; TR Tidwell at 191-192; JA Ex. 2 ¶ 48; JA Ex. 20; GC Ex. 1(o).)

29.  Since October 1, 2013, Respondents have continued to tell employees that there is no union at the facility. (JA Ex. 17.)

. . .

33.  Since October 1, 2013, the Union has held only one union meeting, compared to quarterly meetings previously.  (TR Dudley at 283.)

34.  Since October 1,2013, the Union has experienced limited success in obtaining signed union cards from employees.  (Aff. Dudley at 4;[17] Aff. Tidwell at 3.)

---

[17]The court notes that the Director filed three affidavits from Dudley; this reference is apparently to the second affidavit.  (*See* doc. 16-3 at 26.)

(Doc. 17 at 10-11 [footnote added].)   The court finds that this evidence is insufficient to establish that immediate injunctive relief is just and proper; this evidence does not show Union support is threatened by the actions of the Ridgewoods and/or that the Union cannot be an effective representative should the NLRB order the Ridgewoods to recognize the Union as the successor to Preferred.

Cynthia Dudley has worked at RHS facility since 1974; since 1976, a union has represented the employees.  (Doc. 14-1 at 266, 268.)    Dudley has been president of the Union's Local since 1980.  (*Id*. at 268.)  She testified that the Ridgewoods made changes when they took over operation of the home and that these changes were made unilaterally.  She testified that since the Ridgewoods took over the Union has gone from having four meetings a year to just one meeting since October 1, 2013; she did not testify that the lack of meetings was due to a lack of support for the Union.  When asked why the Union had only one meetings, she testified, "Because we can't post it on the bulletin board.  And people's working doubles, and it's hard to get them on the phone." (*Id*. at 286.)  This testimony does not support a finding that support for the Union is waning.

The Director also cites Dudley's testimony regarding Union cards; she testified, "I have been distributing union cards since on or about the second week after the change-over.  Distribution of cards is difficult since the company does not allow distribution on company time.  I have about ten cards signed.  Some employees are scared because the employment letter they signed said they were at-will and could be fired at any time."  (Doc. 16-3 at 26.)

The Director also cited the affidavit of Joann Tidwell, in which Tidwell testified, "Sometime after October 1, 2013, I received a letter from Ridgewood Heath Services that explained the reasons why the company did not like unions or support them.  Because all employees got this letter, a lot of employees do not want to sign union cards.  I have assisted in distributing union cards since the change-over."  (*Id.* at 71.)  The court finds that the Director has not cited the court to evidence that Union support has been chilled by the Ridgewoods. Nevertheless, the court finds that, even assuming union membership drives have been unsuccessful since the Ridgewoods have assumed operations, the Director has not shown that an order from the NLRB that the Ridgewoods are the successors to Preferred and must recognize and bargain with the Union will not be effective.

The Eleventh Circuit has held, "A bargaining order is appropriate only where the unfair practices have so ***intimidated*** employees that an election, even with the full complement of traditional NLRB remedies, would not reflect their true sentiments." *NLRB v. Goya Foods of Florida*, 525 F.3d 1117, 1128 (11th Cir. 2008)(quoting *Avecor, Inc. v. NLRB*, 931 F.2d 924, 935 (D.C. Cir. 1991)).  The Director has not cited the court to evidence that the Ridgewoods have intimidated, threatened, and/or harassed their employees regarding the Union, Union support, and/or Union membership.  Indeed, this case is distinctive for its lack of any evidence of such vitriol.

The Union had represented the employees in the Jasper nursing home for decades prior to the change in ownership and its Local President remains employed at the facility.

34

The Director has cited the court to no evidence that, despite this lengthy tenure and the employment of the Union's Local President, the Union has become unorganized in the relatively short period of time since the Ridgewoods took over. *Cf. Pascarell for & on Behalf of N.L.R.B. v. Vibra Screw Inc.*, 904 F.2d 874, 879-81 (3d Cir. 1990). This case is about whether the Ridgewoods are the successor to Preferred and, if so, their duty to bargain with the Union. The Director has not cited the court to any evidence that convinces the court the Union will be unable to resume its role as an effective bargaining agent for the Ridgewoods' employees when and if the NLRB orders the Ridgewoods to recognize and bargain with the Union.

The NLRB in a successor case can order the successor employer to recognize and to negotiate with the incumbent Union, it can order instatement, and it can order all changes to be backed out. Nothing in the evidence of this case supports a finding that such orders in this case would be meaningless or futile because the Union has lost support and/or leadership, which it has built over the decades of representing the facility's employees. Certainly the Union and Local President Dudley appear ready and able to resume representing the bargaining unit employees. If the Union is recognized as the employees' representative by the Order of the NLRB, its purpose will certainly be revitalized.

Therefore, the court finds that the Director has not shown that immediate injunctive relief is necessary in order to ensure that the final order of the NLRB is not meaningless or futile.

35

## CONCLUSION

For the foregoing reasons, the court is of the opinion that the Director has failed to show that immediate injunctive relief, pursuant to § 10(j) of the NLRA, is just and proper. An Order denying the Director's Petition for Injunction under Section 10(j) of the National Labor Relations Act, as Amended, (doc. 1), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 22nd December, 2015.

*Sharon Lovelace Blackburn*

SHARON  LOVELACE  BLACKBURN
SENIOR UNITED STATES DISTRICT JUDGE